# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:

RICHARD T. FORD,                                   Case No. 6:10-bk-17864-ABB
                                                    Chapter 13
      Debtor.

_____/

MARY E. FORD,

      Plaintiff,                                    Adv. Pro. No. 6:10-ap-00328-ABB

v.

RICHARD T. FORD,

      Defendant.

_____/


## MEMORANDUM OPINION AND ORDER

This matter came before the Court on the Objection to Debtor's Claim of Exemptions (Doc. No. 16) filed by the Chapter 13 Trustee; the Objection to Debtor's Claim of Exemptions (Doc. No. 17), the Motion to Dismiss or Convert the Case to Chapter 7 (Doc. No. 21), and the Objection to the Plan (Doc. No. 23), all filed by Creditor Mary E. Ford ("Ms. Ford"); and the Amended Complaint (Doc. No. 15 in the adversary proceeding) filed by Plaintiff Ms. Ford against Debtor/Defendant Richard T. Ford ("Mr. Ford") seeking a determination Mr. Ford's debt to Ms. Ford is not dischargeable.

The final evidentiary hearing was held on August 30, 2011 at which Ms. Ford, Mr. Ford, their respective counsel, and counsel for the Chapter 13 Trustee appeared. The parties and the Trustee submitted post-hearing briefs pursuant to the Court's directive.

The Trustee's Objection to Debtor's Claim of Exemptions (Doc. No. 16) is withdrawn, pursuant to her counsel's statement in open court. The Objection to Debtor's Claim of Exemptions (Doc. No. 17) and the Objection to the Plan (Doc. No. 23) filed by Mary E. Ford are due to be overruled. The Motion to Dismiss or Convert the Case to Chapter 7 (Doc. No. 21) is due to be denied. Judgment is due to be entered in favor of Debtor/Defendant Richard T. Ford on the Amended Complaint (Doc. No. 15 in the adversary proceeding).

The Court makes the following Findings of Fact and Conclusions of Law after reviewing the pleadings and evidence, hearing live testimony and argument, and being otherwise fully advised in the premises.

## FINDINGS OF FACT

### *The Marital Settlement Agreement*

Mr. Ford and Ms. Ford married in 1974. They separated in June 2007. They signed a Marital Settlement Agreement ("the MSA") in November 2008. The Circuit Court for the State of Florida entered a Final Judgment dissolving the marriage and incorporating the terms of the MSA in December 2008.

The Fords' two daughters were adults at the time of their parents' divorce. The MSA provides there would be no payment of alimony and no payment of child support. The parties waived any claims for support or maintenance.

The MSA memorializes the Fords' agreement with respect to the distribution of their property. The Fords accumulated assets during the course of their marriage consisting primarily of real estate, mutual funds, IRA accounts, Mr. Ford's interests in his businesses (Dick Ford Construction and Gidad Properties, LLC) and Ms. Ford's interest in her family's business, Le Fils Corporation.

*Real Property*

The MSA provided Mr. Ford would retain certain parcels of real property, including the following:

    a.  "The Mainstreet Investment Parcels":

        239 South Hull Avenue, DeLand, Florida

        2450 Adams Avenue, DeLand, Florida

        3320 Phonetia Drive, DeLand, Florida

    b.  "The Wachovia Investment Parcels":

        435 North Fairview Avenue, DeLand, Florida

        150 West Volusia Avenue, DeLand, Florida

        114 Oaks Circle, DeLand, Florida

    c.  "The Free and Clear Investment Lots":

        340 Holloway Road, Putnam County, Florida

        Parcels 420 and 421, Putnam County, Florida

        1530 E. New York Avenue, DeLand, Florida

    d.  "The Homestead":

        520 Oak Tree Court, DeLand, Florida.

The Mainstreet Investment Parcels and the Wachovia Investment Parcels were subject to mortgages. The Homestead was subject to a line of credit lien held by Mainstreet Bank. Mr. and Ms. Ford were obligors or guarantors on each of the loans secured by the properties. The MSA provided Mr. Ford would pay the loans on the Mainstreet Investment Parcels, Wachovia Investment Parcels, and Homestead and he would hold Ms. Ford harmless from any claims arising out of the encumbered properties and mortgages. The MSA provided Mr. Ford would "continue to timely pay the [Mainstreet] line of credit" on the Homestead and would "hold the Wife harmless from any of the liabilities" relating to the Mainstreet line of credit on the Homestead.

Ms. Ford received five parcels of real estate free and clear of liens and mortgages. The MSA provided the transfers to Ms. Ford were to be made "as directed" by Ms. Ford "including, but not limited to, the Mary Lefils Ford Living Trust."

### Mutual Funds and IRA Accounts

The MSA provided the Fords' interests in the mutual funds and IRA accounts would be split evenly. Those accounts had an aggregate balance of approximately $775,000.00 (approximately $450,000.00 in mutual funds, $300,000.00 in Mr. Ford's IRA, and $25,000.00 in Ms. Ford's IRA) at the time the MSA was executed. These funds were split evenly in December 2008 and January 2009.

Mr. Ford maintained his IRA account; the balance after the equitable distribution was approximately $170,000.00. He opened a new mutual fund account which was titled in his name with a provision it would be Transferred On Death (TOD) to the Fords' two daughters. The value of the mutual fund account was approximately $220,000.00.

*The Businesses*

Mr. Ford retained his interests in his businesses, Dick Ford Construction and Gidad Properties, LLC. Ms. Ford retained her interest in her family's business, LeFils Corporation.

### The Richard T. Ford Trust

The Richard T. Ford Trust ("the Trust") was created by Mr. Ford in August 2009. The Trust is a revocable trust; the Fords' daughters are its only beneficiaries. Mr. Ford funded the trust by transferring ownership of his personal checking and savings accounts to it. He closed his personal mutual fund account (previously listed as TOD to his daughters) and transferred those funds into a mutual fund account in the name of the Trust.

Mr. Ford's testimony regarding creation of the Trust was uncontroverted and credible. It was created for estate planning purposes. Mr. Ford was in a serious romantic relationship; he wanted to insure his assets would go to his daughters if he died. Mr. Ford had received almost nothing from his father's estate; he did not want his daughters to be in the same situation.

### Mr. Ford's Financial Difficulties

Mr. Ford's testimony regarding the decline in his business was uncontroverted and credible. He is a third generation builder. His construction business all but ceased to exist as a result of the recession and the collapse of the real estate market in Florida. The economic downturn and resulting decline in his business caused Mr. Ford's income to decrease such that he became unable to make the payments on all the mortgage loans.

Mr. Ford received a notice from Mainstreet Bank in late 2009 a balloon payment would be due on December 18, 2009 on the loan secured by the Mainstreet Investment Parcels. He was previously unaware the balloon payment was coming due. Mr. Ford sent a letter to Ms. Ford on December 1, 2009, advising he could no longer support the expenses of the Mainstreet Investment Parcels. The letter apologized to Ms. Ford for any inconvenience she may be caused and told her Mr. Ford had directed the property management company to send all rents collected from the properties to Mainstreet Bank to be applied to the mortgage loan. Copies of the letter were sent to the property manager and a Mainstreet Bank representative.

Mainstreet Bank's attorney sent Mr. Ford, Ms. Ford, and Gidad Properties, LLC a letter on January 25, 2010 declaring the loan secured by the Mainstreet Investment Parcels in default and accelerating the loan. Mr. Ford and Ms. Ford met with a Mainstreet Bank representative to discuss the status of the loan on February 5, 2010. Mr. Ford explained again he could not pay the loan. Mainstreet Bank reserved its rights to proceed with legal action against Mr. Ford, Ms. Ford, and Ms. Liljeros, one of the Fords' daughters who guaranteed the loan.

Ms. Ford sued Mr. Ford in State Court for breach of his MSA obligations. Service of process was effected on March 26, 2010.

Mr. Ford used funds from the Trust he had created the previous August to pay Mainstreet Bank the entire balance on the line of credit secured by the Homestead ($156,731.93) on April 9, 2010.[1] This payment freed the Homestead of all liens. Mr.

---

[1] Mr. Ford also used Trust monies to fund a Roth IRA for himself ($12,000.00), to support his business Dick Ford Construction, Inc., to pay attorneys' fees, and to pay personal living expenses.

Ford's testimony regarding his motivation in paying the line of credit was credible. Mr. Ford was concerned about the severe decline in his business and the bleak outlook for the building industry in Central Florida. He was fifty-four years old and uncertain whether the building business would recover in his working lifetime. He paid the loan off because he wanted to insure he would have a "roof over his head."

Mainstreet Bank instituted a foreclosure proceeding with respect to the Mainstreet Investment Parcels against Mr. Ford, Ms. Ford, Ms. Liljeros, and Gidad Properties, LLC in May 2010. Mainstreet Bank obtained a judgment of $464,784.96 against all defendants on September 28, 2010. Mr. Ford filed his Chapter 13 petition a week later; the State Court proceedings were stayed as to him pursuant to 11 U. S. C. Section 362.

The Mainstreet Investment Parcels were valued at approximately $165,000.00. The deficiency judgment of approximately $300,000.00, against Ms. Ford, Ms. Liljeros, and Gidad Properties, LLC ("the Mainstreet Investment Parcels deficiency judgment"), was paid by Ms. Ford. Payment of the judgment, in conjunction with the indemnity agreement in the MSA, establishes Ms. Ford as holder of the great majority of the unsecured debt owed by Mr. Ford.

### *The Bankruptcy*

Mr. Ford filed his Chapter 13 petition on October 5, 2010. His original petition, filed with the help of counsel, failed to disclose his ownership of the Roth IRA and erroneously claimed individual ownership of some properties actually owned by Gidad Properties, LLC. The schedules were amended to correct these and other errors in March 2011, when Mr. Ford retained new counsel.

---

Mainstreet Bank cut off Mr. Ford's ability to draw on the line of credit secured by the Homestead when he defaulted on the loan secured by the Mainstreet Investment Parcels.

Ms. Ford filed her original complaint (Doc. No. 1 in the adversary proceeding), Objection to Debtor's Claim of Exemptions (Doc. No. 17), Motion to Dismiss or Convert the Case to Chapter 7 (Doc. No. 21), and Objection to the Plan (Doc. No. 23) in December 2010. Mr. Ford filed a Notice of Voluntary Dismissal, which he personally signed, on January 7, 2011 (Doc. No. 25). Ms. Ford objected to the dismissal on the basis Mr. Ford filed bankruptcy in bad faith. The case was not dismissed. Mr. Ford retained new counsel who filed amended schedules two months later.

The Trustee originally objected to Mr. Ford's claim of exemption on his IRA (Doc. No. 16) but has withdrawn the objection. Ms. Ford joined in the Trustee's objection and objected to Mr. Ford's claim of homestead exemption (Doc. No. 17). Ms. Ford has abandoned her objection to the IRA exemption but continues to object to Mr. Ford's claim of homestead exemption. She seeks a determination Mr. Ford's homestead is exempt only to the extent its value exceeds the $156,731.93 Mr. Ford paid Mainstreet Bank in April 2009. Ms. Ford is pursuing dismissal of Mr. Ford's case or conversion of the case to Chapter 7 on the basis the case was filed in bad faith and the Chapter 13 plan was proposed in bad faith.

Ms. Ford filed Claim 5 in January 2011. The claim arises out of Mr. Ford's MSA obligation to indemnify Ms. Ford with regard to any liability arising out of mortgage obligations on the properties Mr. Ford retained per the MSA. Ms. Ford amended her claim on September 16, 2011, after she paid $300,000.00 to Mainstreet Bank in satisfaction of the Mainstreet Investment Parcels deficiency judgment against herself, Ms. Liljeros, and Gidad Properties, LLC. Amended Claim 5-2 is an unsecured claim for $416,897.51. No objection to Claim 5-2 has been filed.

Claim 6 was filed by Mainstreet Bank. It is an unsecured claim for $320,784.96, arising out of the deficiency on the Mainstreet Investment Parcels. Claim 6 was transferred and assigned to Ms. Ford on August 29, 2010, after Ms. Ford paid Mainstreet Bank $300,000.00. Ms. Ford's counsel filed the assignment of claim on September 16, 2010. Claim 6 is duplicative of Claim 5-2; both claims seek payment from Mr. Ford based on Ms. Ford's payment in satisfaction of the Mainstreet Investment Parcels deficiency judgment. No objection to Claim 6 has been filed.

Mr. Ford has filed a Third Amended Chapter 13 Plan ("the Plan"). The Plan is a good faith effort to repay the claims of his creditors to the best of his ability. The Plan surrenders the three Wachovia Investment Parcels to the secured creditor in full satisfaction of its claims. It sets Monthly Plan Payments to unsecured creditors at $405.49. It surrenders the three Free and Clear Investment Lots to be sold at auction; the auction proceeds will pay real property tax claims and fund payments to unsecured creditors (over and above the currently scheduled Monthly Plan Payments). The Plan treats all unsecured creditors similarly; each will receive a pro rata share of the balance of the auction proceeds remaining after payments to secured creditors are made.

Mr. Ford is current in his Plan payments. He has made eleven Plan payments and has been timely in making each of them. He has complied with all requests of the Chapter 13 Trustee. The Trustee filed post-hearing briefing indicating she believes Mr. Ford has acted in good faith.

Ms. Ford's complaint in the adversary proceeding (Doc. No. 15) seeks a determination Mr. Ford's debt to her is nondischargeable. The parties agree any claim Ms. Ford has is not a claim for a "domestic support obligation," as the term is used in 11

U.S.C. Section 523(a)(5); as such, it will be discharged if Mr. Ford receives a Chapter 13 discharge pursuant to 11 U.S.C. Section 1328(a). (Doc. 83 at 76; Doc. 84 at 14.) They agree her claim <u>is</u> accurately characterized as a debt to a former spouse, arising out of a divorce, in connection with a divorce decree, and would not be dischargeable in a Chapter 7 case pursuant to 11 U.S.C. Sections 523(a)(15) and 727. (Doc. 83 at 76; Doc. 84 at 14.)

### *Conclusion*

Mr. Ford is entitled to the Florida constitutional homestead exemption. There is no basis for imposition of an equitable lien upon the Homestead.

The totality of circumstances establishes Mr. Ford has acted in good faith. He has not abused the provisions, purpose, or spirit of the Bankruptcy Code. The Plan represents a good faith effort by Mr. Ford to satisfy his creditors' claims and it was proposed with a sincere intent to repay his debts. He has not engaged in any bad faith conduct.

Any debt Mr. Ford has to Ms. Ford will be discharged if Mr. Ford receives a discharge pursuant to 11 U.S.C. Section 1328(a).

## <u>CONCLUSIONS OF LAW</u>

### *The Exemption Objections*

#### *IRA*

The Trustee objected to Mr. Ford's claim of exemption on his IRA. Ms. Ford joined in the Trustee's objection to the claim of exemption to the IRA. The evidence at trial was undisputed. The IRA balance has remained relatively constant, but for

investment gains and losses, since the account was split between Mr. Ford and Ms. Ford pursuant to the MSA. The Trustee withdrew her objection in open court on August 30, 2011. Ms. Ford has abandoned her joinder in the objection; she presented no evidence and made no argument in support of her objection to the IRA exemption at trial or in post-trial briefing.

The Trustee's objection to Mr. Ford's claim of exemption on his IRA (Doc. No. 16) is withdrawn. Ms. Ford's joinder in the objection (Doc. No. 17) is overruled.

*Homestead*

Mr. Ford claims the Florida constitutional exemption on the Homestead. See Art. X, § 4 Fla. Const. Ms. Ford objects and seeks a determination Mr. Ford's homestead is exempt only to the extent its value exceeds the $156,731.93 Mr. Ford paid Mainstreet Bank in April 2009. She argues Mr. Ford converted non-exempt assets (cash from the Trust account) into exempt assets (the Homestead) for the purpose of hindering, delaying, or defrauding creditors; she argues this motivation to frustrate creditors is clear when the timing of the payment to Mainstreet Bank is considered. Ms. Ford sued Mr. Ford in State Court in late March 2010. Mr. Ford paid off the loan secured by the Homestead in early April.

Ms. Ford raises legitimate concerns about Mr. Ford's conversion of non-exempt assets into his exempt homestead. The timing of Mr. Ford's payment to Mainstreet Bank does not establish conclusively a bad faith motive for paying off the line of credit secured by the Homestead. Mr. Ford testified credibly about his state of mind. He wanted to insure he would have a "roof over his head" in light of the severe decline in his business and bleak outlook for the building industry in Central Florida. Mr. Ford was fifty-four

years old and uncertain whether the building business would recover in his working lifetime. Mr. Ford's motivation in paying off the Homestead was not to hinder, delay, or defraud creditors.

Mr. Ford is entitled to the Florida constitutional homestead exemption. He would be entitled to that exemption even if his motivation in paying off the loan secured by the Homestead were to frustrate creditors.

> The transfer of nonexempt assets into an exempt homestead with the intent to hinder, delay, or defraud creditors is not one of the three exceptions to the homestead exemption provided in article X, section 4. Nor can we reasonably extend our equitable lien jurisprudence to except such conduct from the exemption's protection. We have invoked equitable principles to reach beyond the literal language of the exceptions only where funds obtained through fraud or egregious conduct were used to invest in, purchase, or improve the homestead.

Havoco of Am., Ltd. v. Hill, 255 F.3d 1321 (11th Cir. 2001) (quoting Havoco of Am., Ltd. v. Hill, 790 So. 2d 1018, 1028 (Fla. 2001)); see also In re Laing, 329 B.R. 761, 769 (Bankr. M.D. Fla. 2005) ("While this record certainly supports and warrants the inference that the Debtor's primary, if not the sole purpose, in purchasing the Florida Condominium was to protect his home from any claim which may be asserted against him by the [creditor], this alone is not sufficient to defeat his homestead exemption claim. . . . [T]he motive of a Debtor for the purpose of acquiring a homestead is of no consequence . . . .")

There is no basis for imposition of an equitable lien upon the Homestead. An equitable lien may be imposed on an exempt Florida homestead only "where funds obtained through fraud or egregious conduct were used to invest in, purchase, or improve the homestead." Havoco, 790 So. 2d at 1028. Ms. Ford did not present any evidence the

$156,731.93 Mr. Ford used to pay off the line of credit secured by the Homestead was obtained through fraud or other egregious conduct. Those monies were property of the Trust created by Mr. Ford the previous year and funded with his share of the marital assets divided pursuant to the MSA.

Ms. Ford's objection to Mr. Ford's claim of homestead exemption (Doc. No. 17) is overruled. No equitable lien shall be imposed.

### *The Motion to Dismiss or Convert & Ms. Ford's Objection to the Plan*

Section 1307(c) of the Bankruptcy Code provides, on request of a party in interest or the United States Trustee, a court may dismiss a Chapter 13 case or convert it to a Chapter 7 case for cause. 11 U.S.C. § 1307(c). "[L]ack of good faith in filing a bankruptcy petition constitutes cause . . . under § 1307(c)." In re Fretwell, 281 B.R. 745, 749 (Bankr. M.D. Fla. 2002); see also In re Letterese, 397 B.R. 507, 515-16 (Bankr. S.D. Fla. 2008).

Courts apply the same substantive standards when considering a motion to dismiss for lack of good faith and determining whether a plan to pay creditors is proposed in good faith. Fretwell, at 749. The burdens of proof are different. A party seeking dismissal pursuant to Section 1307(c) bears the burden of proof; a Chapter 13 debtor has the burden of proving his plan was proposed in good faith. Id., at 750 & n.3. The success of Ms. Ford's Motion to Dismiss or Convert the Case to Chapter 7 hinges upon her ability to establish Mr. Ford did not act in good faith in filing this Chapter 13 case.[2] Mr. Ford must establish he acted in good faith in proposing his plan to pay creditors to

---

[2] Ms. Ford does not argue Mr. Ford is ineligible to be a Chapter 13 debtor for any reason other than the alleged bad faith.

succeed in defeating Ms. Ford's Objection to the Plan. <u>In re Vick</u>, 327 B.R. 477, 486 (Bankr. M.D. Fla. 2005).

The phrase "good faith" is not defined in the Bankruptcy Code. The existence or nonexistence of good faith is determined through a review of the totality of circumstances. <u>Kitchens v. Georgia R.R. Bank & Trust Co. (In re Kitchens)</u>, 702 F.2d 885, 888 (11th Cir. 1983) "Broadly speaking, the basic inquiry should be whether or not under the circumstances of the case there has been an abuse of the provisions, purpose or spirit of [the Bankruptcy Code]." <u>Id.</u> (<u>citations omitted</u>).

Factors relevant to the good faith determination include:

(1)     an analysis of the debtor's income from all sources and expenses;
(2)     the probable or expected duration of the Chapter 13 plan;
(3)     the motivations of the debtor and his sincerity in seeking relief under the provisions of Chapter 13;
(4)     the debtor's degree of effort;
(5)     the debtor's ability to earn and the likelihood of fluctuation in his earnings;
(6)     the circumstances under which the debtor has contracted his debts;
(7)     his past dealings with his creditors;
(8)     the accuracy of the plan's statements of debts and expenses;
(9)     the frequency with which the debtor has sought bankruptcy relief; and
(10)    whether any inaccuracies are an attempt to mislead the court.

<u>See id.</u> at 888-89; <u>Vick</u>, at 486. The list of factors is not exhaustive, "but they should aid bankruptcy courts as they determine whether debtors have proposed chapter 13 plans in good faith." <u>Kitchens</u>, at 889. "The guiding principle is whether the debtor proposed his Chapter 13 plan with a sincere intent to repay, to the best of his ability, the claims of his creditors or, instead, whether the Chapter 13 filing was an attempt to defer or avoid the claims of legitimate creditors." <u>Vick</u>, at 486.

Ms. Ford argues Mr. Ford's prepetition transfer of non-exempt assets into the Homestead and Roth IRA and his filing of a notice of voluntary dismissal (in response to

her numerous filings in his bankruptcy case) establish Mr. Ford filed for bankruptcy protection in bad faith. They do not.

This bankruptcy filing is not an abuse of the bankruptcy process. Mr. Ford began suffering financial difficulty in 2009. His construction business was struggling, he had few prospects for lucrative construction work, and he was overburdened by debt. He was fifty-four years old and uncertain whether the building business would recover in his working lifetime.

Mr. Ford did not have enough money to pay all his creditors and expenses; he chose to pay the loan secured by his home and put $12,000.00 in a Roth IRA. He used the remaining Trust monies to pay his personal expenses and those of his business while he attempted to generate construction business. Mr. Ford's testimony regarding his motivation for using Trust funds to pay off the loan secured by the Homestead was credible. He wanted to insure he would have a "roof over his head" in light of the severe decline in his business and the bleak outlook for the building industry in Central Florida.

He was forthcoming with his creditors about his financial difficulties. He sent a letter to Ms. Ford and Mainstreet Bank in December 2009 informing them of his inability to pay the loan secured by the Mainstreet Investment Parcels; he met with those same parties shortly thereafter to discuss the loan status; and he instructed the property manager of the Mainstreet Investment Parcels to pay all rents received directly to Mainstreet Bank as payment on the mortgage loan.

Mr. Ford did not act fraudulently. He was unable to meet all his financial obligations. He paid what he could, prioritizing his home, retirement, and basic living expenses while trying to generate income. He was unsuccessful at winning lucrative

construction jobs and, in October 2010, he took the next step in attempting to salvage his financial future: he filed Chapter 13.

Mr. Ford considered dismissal of his case when faced with Ms. Ford's numerous challenges, going so far as to file a notice of dismissal himself. The case was not dismissed; instead, Mr. Ford employed new counsel and filed amended schedules to correct inaccuracies in his original filings. Mr. Ford's attempt to dismiss his case does not indicate he sought to evade creditors; indeed, outside bankruptcy, he would have been without statutory protection from his creditors' pursuit.

Mr. Ford's Chapter 13 plan, now in its third iteration, is a good faith effort to repay the claims of his creditors to the best of his ability. The Plan surrenders the three Wachovia Investment Parcels to the secured creditor in full satisfaction of its claims. It sets Monthly Plan Payments to unsecured creditors at $405.49. It surrenders the three Free and Clear Investment Lots, to be sold at auction. The auction proceeds will pay real property tax claims and fund payments to unsecured creditors (over and above the currently scheduled Monthly Plan Payments). The Plan treats all unsecured creditors similarly; each will receive a pro rata share of the balance of the auction proceeds remaining after payments to secured creditors are made.

Mr. Ford is current in his Plan payments. He has made eleven Plan payments and has been timely in making each of them. He has complied with all requests of the Chapter 13 Trustee. The Trustee filed post-hearing briefing indicating she believes Mr. Ford has acted in good faith.

The totality of the circumstances establishes Mr. Ford has acted in good faith in filing for Chapter 13 protection and proposing a plan to pay his creditors. He is utilizing

the bankruptcy process for its intended purposes: to resolve his creditors' claims through equitable distribution of his assets and obtain a fresh start.

Ms. Ford's Motion to Dismiss or Convert the Case to Chapter 7 (Doc. No. 21) is denied. Her Objection to the Plan (Doc. No. 23) is overruled.

*The Adversary Complaint*

Ms. Ford cannot succeed in the adversary action. Her Amended Complaint seeks a nondischargeability determination for her claim. She acknowledges, however, her claim arises out of the MSA indemnity provision; is not a claim for a "domestic support obligation," as the term is used in 11 U.S.C. Section 523(a)(5); and will be discharged if Mr. Ford receives a Chapter 13 discharge pursuant to 11 U.S.C. Section 1328(a). (Doc. 83 at 76; Doc. 84 at 14.)

Ms. Ford concedes her claim is characterized accurately as a debt to a former spouse arising out of a divorce in connection with a divorce decree. See 11 U.S.C. § 523(a)(15). Her claim would not be dischargeable in a Chapter 7 case, pursuant to 11 U.S.C. Sections 523(a)(15) and 727. (Doc. 83 at 76; Doc. 84 at 14.).

The relief Ms. Ford seeks would be available only if Mr. Ford's case were converted from Chapter 13 to Chapter 7.

Conversion is denied for the reasons stated above. The totality of circumstances establishes Mr. Ford has acted in good faith. He has not abused the provisions, purpose, or spirit of the Bankruptcy Code. The Plan represents a good faith effort by Mr. Ford to satisfy his creditors' claims and it was proposed with a sincere intent to repay his debts. He has not engaged in any bad faith conduct.

Any debt Mr. Ford has to Ms. Ford will be discharged if Mr. Ford receives a discharge pursuant to 11 U.S.C. Section 1328(a).  Judgment is due Mr. Ford.


Accordingly, it is

**ORDERED, ADJUDGED and DECREED** that the Trustee's Objection to Debtor's Claim of Exemptions (Doc. No. 16) is **WITHDRAWN**; and it is further

**ORDERED, ADJUDGED and DECREED** that the Objection to Debtor's Claim of Exemptions by Mary E. Ford (Doc. No. 17) is **OVERRULED**; and it is further

**ORDERED, ADJUDGED and DECREED** that the Motion to Dismiss or Convert the Case to Chapter 7 by Mary E. Ford (Doc. No. 21) is **DENIED**; and it is further

**ORDERED, ADJUDGED and DECREED** that the Objection to the Plan  by Mary E. Ford (Doc. No. 23) is **OVERRULED**; and it is further

**ORDERED, ADJUDGED and DECREED** that the relief sought in Plaintiff Mary E. Ford's Amended Complaint (Doc. No. 15 in Adv. Pro. No. 6:10-ap-00328-ABB) is **DENIED**.

A separate judgment consistent with these findings and conclusions shall be entered contemporaneously.


Dated this 13th day of October, 2011.

ARTHUR B. BRISKMAN
United States Bankruptcy Judge